T.C. Memo. 2018-32

UNITED STATES TAX COURT

DTDV, LLC, RICHARD G. VENTO, TAX MATTERS PARTNER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 741-09.                          Filed March 20, 2018.

        P transferred stock in O Corp. to D, a limited liability company,
when O was negotiating its possible acquisition by A Corp.  On Nov.
24, 2000, O and A executed agreements providing for A's acquisition
of O's stock for $17.75 per share.  On that same day, P assigned a
36% interest in D to S, a foreign entity formed to hold segregated
account investment reserves in support of an insurance policy on P's
life.  In return, S agreed to make specified annual payments to P
beginning after seven years and continuing for so long as P's wife
remained alive.  P and S valued the assigned interest in D using the
$13.50 per-share closing price of O stock on Nov. 24, 2000.  When D
sold its O stock to A in January 2001, D allocated 36% of its resulting
gain to S.  R seeks to reallocate to P and his wife the partnership gain
that D allocated to S.  P claims that, because R did not issue his
FPAA until more than three years after D filed its partnership income
tax return for 2001, the period of limitations provided in I.R.C. sec.
6229(a) prevents the assessment of tax as a result of the FPAA
adjustments.  P claims further that, because D made a valid election
under I.R.C. sec. 754 with its 2000 return, it properly reduced its

**[*2]** reported gain from its sale of O stock in 2001 by a sec. 743(b) basis adjustment allocated to S and thus did not omit an amount of gross income sufficient to trigger the six-year limitations period provided in I.R.C. sec. 6229(c)(2). R claims that D's purported sec. 754 election was invalid because P's assignment to S of an interest in D must be disregarded.

Held: Any shift in gain from P to S that might violate the assignment of income doctrine does not justify disregarding altogether S' interest in D.

Held, further, because P's transfer to S of an interest in D must be respected for Federal income tax purposes, D validly made a sec. 754 election in connection with that transfer and, by reason of the resulting sec. 743(b) adjustment, did not omit from its gross income for 2001 an amount in excess of 25% of its reported gross income.

Held, further, R cannot assess tax attributable to the FPAA adjustments. See I.R.C. sec. 6229(a).

Val J. Albright, for petitioner.

John Aletta and Patrick F. Gallagher, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, Judge: This case is before us for a review of a notice of final partnership administrative adjustment (FPAA) issued on October 9, 2008, to DTDV, LLC (DTDV), a Colorado limited liability company (LLC) classified as a

**[\*3]** partnership for Federal tax purposes.  See sec. 301.7701-3(b)(1)(i), Proced. &

Admin. Regs.  On October 20, 2002, DTDV filed with the Internal Revenue

Service (IRS) a Form 1065, U.S. Return of Partnership Income, for its 2001

taxable year.  On that return, DTDV reported distributions and various items of

income that it allocated among four partners:  petitioner, his wife Lana, Square

Leg Ltd. (Square Leg), and the Dick and Lana Charitable Support Organization

(Charitable Support Organization).  The principal adjustments in the FPAA

reallocate to petitioner and Lana amounts that DTDV had allocated to the other

partners.  The FPAA also determined that the underpayments of tax resulting from

respondent's adjustments of DTDV's partnership items were subject to the

negligence and substantial understatement penalties provided in section 6662.[1]  In

a petition postmarked January 2, 2009 (and filed by the Court on January 8, 2009),

petitioner assigns error to respondent's adjustments and to his determination of

penalties.  The petition also challenges the FPAA's validity on the grounds that

respondent issued it more than three years after DTDV filed the return to which it

relates.

---

[1]All section references are to the Internal Revenue Code in effect for 2001, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

[*4]                              FINDINGS OF FACT

Formation and Governance of DTDV

DTDV was formed in September 2000, when Objective Systems Integrators, Inc. (OSI), a corporation of which petitioner was a cofounder and shareholder, was negotiating its possible acquisition by Agilent Technologies, Inc. (Agilent). In October 2000, petitioner transferred 2,500,000 shares of OSI stock to DTDV.

DTDV's articles of organization appointed petitioner as the entity's "manager" and vested in him authority to manage the entity. In that capacity, petitioner could determine the timing of any distributions by the entity. Petitioner failed to introduce DTDV's operating agreement or any testimony describing its terms.

Petitioner's Assignment to Square Leg

Petitioner entered into a purchase agreement with Square Leg dated November 24, 2000, that provided for the assignment by petitioner to Square Leg of a 36% interest in DTDV in exchange for Square Leg's agreement to make specified annual payments to petitioner beginning in seven years and continuing for the remainder of Lana's life. Square Leg was a Cayman Islands subsidiary of Lighthouse Capital Insurance Co. (Lighthouse), which was also a Cayman Islands entity. Petitioner testified that he assigned part of his interest in DTDV to Square

[*5] Leg for estate planning purposes and that, when he entered into his purchase agreement with Square Leg, he expected it to fulfill its obligation to make annuity payments.

The purchase agreement states the parties' agreement that the assigned interest had a fair market value of $12,150,000. It also states that the required annuity payments were "calculated according to actuarial tables published by the Internal Revenue Service and are intended to represent a present value equal to the fair market value" of that interest. The $12,150,000 stated purchase price for the interest in DTDV that petitioner assigned to Square Leg was determined using the $13.50 per-share price for OSI stock at the close of trading on the NASDAQ market on November 24, 2000 (2,500,000 OSI shares held by DTDV × $13.50 × .36 = $12,150,000).

The purchase agreement includes the following representation and warranty by petitioner (as "Seller") to Square Leg (as "Purchaser"):

> Seller is ready, willing and able to sell, assign, transfer and deliver to Purchaser, and hereby sells, assigns, transfers and delivers or causes to be sold, assigned, transferred or delivered to Purchaser the LLC Interest free and clear of all liens, encumbrances and adverse claims whatsoever; and upon the sale, assignment, transfer and delivery of the LLC Interest to Purchaser in accordance with the provisions hereof there will be vested in Purchaser good and valid title to the LLC Interest, free and clear of all liens, encumbrances and adverse claims whatsoever.

**[*6]** The agreement defines the LLC Interest as 36% of the membership interests in DTDV.

Petitioner also executed a separate document entitled "Assignment of Interest in DTDV L.L.C." The assignment states that petitioner was making his assignment to Square Leg "[i]n accordance with the approval of all members of DTDV L.L.C., at the company meeting of DTDV L.L.C. on November 24, 2000".

The Lighthouse Life Insurance Policy

Square Leg was formed to hold segregated account investment reserves backing a life insurance policy that Lighthouse issued to petitioner. Petitioner's policy with Lighthouse was a variable policy, the value of which varied with Square Leg's investments. Although petitioner's insurance policy with Lighthouse allowed him to receive policy loans and distributions of cash surrender value, petitioner did not exercise those rights.

Agilent's Acquisition of OSI

At 10:15 a.m. Pacific time on Friday, November 24, 2000 (the date of the purchase agreement governing petitioner's assignment to Square Leg), OSI's board of directors began a telephonic meeting to consider the terms of a proposed acquisition of OSI by Agilent. On the afternoon of that same day, after OSI's board had approved the transaction, Agilent, OSI, and an Agilent acquisition

[*7] subsidiary executed agreements providing for Agilent's acquisition of OSI's stock by means of a merger of the acquisition subsidiary into OSI. In the merger, each share of OSI stock would be exchanged for $17.75.

On Monday, November 27, 2000, Agilent and OSI issued a press release announcing their planned acquisition. After that announcement, the market price of OSI stock increased to reflect the expected acquisition. For example, on Tuesday, November 28, 2000, Dan Line, a senior vice president of OSI, sold 82,499 OSI shares for $17.50 per share (just $0.25 per share less than the price Agilent had agreed to pay for the OSI stock).

On January 8, 2001, when Agilent completed its acquisition of OSI, DTDV exchanged its 2,500,000 shares of OSI stock for cash of $44,375,000 (2,500,000 × $17.75).

Redemption of Square Leg's Interest in DTDV

Around April 2001, petitioner advised his attorney, Robert Colvin, of plans for DTDV to make private equity investments. Mr. Colvin expressed concern about potential adverse U.S. income tax consequences to Square Leg of investments by DTDV in U.S. business operations. Thereafter, on May 2, and June 8, 2001, Square Leg received in redemption of its interest in DTDV

**[*8]** distributions totaling $15,975,000, equal to 36% of the proceeds that DTDV received in exchange for its OSI stock ($44,375,000 × .36 = $15,975,000).

DTDV's Tax Reporting

In October 2001, DTDV filed its 2000 Form 1065. Schedule M-2, Analysis of Partners' Capital Accounts, of that return reports a balance of $303 in the partners' aggregate capital accounts at the end of the year. The return includes a statement captioned "SECTION 754 ELECTION". That statement reads: "The partnership hereby elects, pursuant to IRC Sec. 754 and Reg. 1.754-1(b)(1), to adjust the basis of partnership property as a result of a distribution of property or a transfer of a partnership interest as provided in IRC Secs. 734(b) and 743(b)." In the copy of the return included in the record, the election statement has a "SIGN HERE" sticker with an arrow pointing to a blank line provided for petitioner's signature. A supplemental schedule to DTDV's 2000 return refers to a "Sec. 754 Adjustment" of $12,150,000" (offset by a "Contra Sec 754 Adjustment" of −$12,150,000).

In its 2001 return, DTDV reported gain of $32,224,697 as a result of its exchange of OSI stock for $44,375,000. It reported that gain not on Schedule D, Capital Gains and Losses, of its Form 1065, but instead as "Other income" on line 7 of Schedule K, Partners' Shares of Income, Credits, Deductions, etc. The

[*9] $32,224,697 that DTDV reported as "Other income" was reported as such on line 7 of a Schedule K-1, Partner's Share of Income, Credits, Deductions, etc., issued to DTDV by VIFX, LLC, a limited liability company formed under U.S. Virgin Islands law of which DTDV was a member. DTDV allocated to Square Leg $3,824,891 of the $32,224,697 of gain that it reported from its sale of OSI stock. That amount equals 36% of the excess of the $44,375,000 cash DTDV received for the stock over a claimed partnership basis of $303, reduced by a claimed section 743(b) basis adjustment of $12,150,000.[2]

DTDV's 2001 return also reported $4,769 of interest income and $477 of ordinary dividends.

Schedule M-2 of DTDV's 2001 Form 1065 shows an opening aggregate capital account balance of $303 and "Capital contributed during year" of $12,500,000.

---

[2]In other words, the partnership's reporting implicitly determined total partnership gain of $44,374,697, equal to the excess of its $44,375,000 amount realized over a claimed partnership "common" basis of $303. The partnership then allocated 36% of that partnership gain (or $15,974,891) to Square Leg before reducing Square Leg's share of that gain by a claimed sec. 743(b) basis adjustment of $12,150,000 ($15,974,891 − $12,150,000 = $3,824,891).

**[*10]** <u>The Ventos' 2001 Tax Reporting</u>

The Ventos filed tax returns for 2001 with the Virgin Islands Bureau of Internal Revenue (BIR) on October 15, 2002. They did not file a U.S. income tax return for 2001.

<u>Square Leg's Default on Its Annuity Obligation</u>

Contrary to petitioner's professed expectations, Square Leg did not fulfill its obligation to make annuity payments to petitioner. After petitioner and others brought suit against Square Leg for its default on its private annuity obligation, an arbitrator awarded them money damages.

OPINION

I.      <u>Introduction</u>

Because petitioner filed a petition for readjustment of partnership items with this Court within 90 days of the date of respondent's FPAA,[3] section 6226(f) grants us jurisdiction to determine DTDV's "partnership items" for 2001 and the

---

[3]Although the Court did not receive and file petitioner's petition until January 8, 2009, 91 days after respondent issued the FPAA, the petition was postmarked January 2, 2009, and thus deemed to have been delivered to the Court on that date. <u>See</u> sec. 7502(a) (providing that date of postmark treated as date of delivery of "any * * * document required to be filed * * * under authority of any provision of the internal revenue laws"); sec. 301.7502-1(b)(1)(iii), Proced. & Admin. Regs. (defining "document", for purposes of the "timely mailed, timely filed" rule of sec. 7502, to include petitions filed with the Tax Court).

[*11] proper allocation of those items among its partners.  Section 6226(f) also grants us jurisdiction to determine "the applicability of any penalty * * * which relates to an adjustment to a partnership item."  Section 6231(a)(3) defines partnership item to mean, "with respect to a partnership, any item required to be taken into account for the partnership's taxable year under any provision of subtitle A [sections 1-1563] to the extent regulations prescribed by the Secretary provide that, for purposes of this subtitle, such item is more appropriately determined at the partnership level than at the partner level."  Section 301.6231(a)(3)-1(a)(1)(i), Proced. & Admin. Regs., provides that partnership items include the partnership aggregate and each partner's share of items of income, gain, loss, deduction, or credit of the partnership.

We begin by considering petitioner's claim that "the limitations period for assessing income tax attributable to partnership items has expired."  Before trial, petitioner moved for summary judgment in DTDV's favor on the grounds that the FPAA adjustments were either time barred or barred by closing agreement.  We denied petitioner's motion because of the existence of disputed questions of material fact and unanswered legal questions.  In his posttrial briefs, petitioner renews his claim regarding the expiration of the period of limitations.  As a matter of practice, this Court "will not consider adjustments made in an FPAA if the

[*12] FPAA has been issued after the time for assessing tax against all of the partners has expired." Highwood Partners v. Commissioner, 133 T.C. 1, 11 (2009). Therefore, the question of whether the applicable period of limitations has expired is a threshold issue that could render moot the merits of respondent's adjustments and penalty determinations.

A.      Statutory Rules Limiting Assessments

Section 6501(a) generally requires the Commissioner to assess tax within three years of the filing of the relevant return. The period of limitations may be extended, however, in the case of a substantial omission of gross income. In particular, section 6501(e)(1)(A) provides: "If the taxpayer omits from gross income an amount properly includible therein and * * * is in excess of 25 percent of the amount of gross income stated in the return * * * the tax may be assessed * * * at any time within 6 years after the return was filed."

In addition, section 6229(a) can extend the period of limitations for assessing income tax attributable to partnership items or affected items.[4] Under that section, the period for assessing tax attributable to a partnership item or an affected item for a partnership taxable year cannot close earlier than three years

_____

[4]An item is an "affected item" to the extent that it "is affected by a partnership item." Sec. 6231(a)(5).

**[\*13]** after the due date of the partnership's return for the taxable year (or, if later, the date on which the partnership filed its return).

As with the general limitations period of section 6501(a), the period described in section 6229(a) can be extended as a result of a substantial omission of gross income. If a partnership omits gross income from its return in an amount in excess of 25% of the gross income shown on the return, the period described in section 6229(a) is extended to six years from the due date (or filing) of the partnership's return. Sec. 6229(c)(2).

The mailing of an FPAA to a partnership's tax matters partner suspends the running of the section 6229(a) period. Sec. 6229(d). If the tax matters partner files a petition for readjustment of partnership items under section 6226, the section 6229(a) period remains suspended during the resulting court proceedings and for one year after the court's decision becomes final. Sec. 6229(d). The extent to which section 6229(a) extends the period of limitations on the assessment of tax attributable to partnership or affected items is itself a partnership item that must be determined in a partnership-level proceeding. E.g., Weiner v. United States, 389 F.3d 152, 156 (5th Cir. 2004); Chimblo v. Commissioner, 177 F.3d 119, 125 (2d Cir. 1999), aff'g T.C. Memo. 1997-535.

**[*14]** B.     The Relevance of DTDV's Omission of Substantial Gross Income

It appears that respondent would be barred from assessing against the Ventos any tax that would result from our upholding the FPAA adjustments and penalties unless section 6229(a) extends the period for doing so.  (Because the FPAA adjustments reallocate to petitioner and Lana the distributive share items that DTDV allocated to Square Leg and the Charitable Support Organization, the Ventos are the only taxpayers who could be assessed tax as a result of those adjustments.)  The parties agree that the Ventos were bona fide residents of the Virgin Islands for 2001.  Therefore, although the Ventos filed no U.S. income tax return for 2001, the filing of their Virgin Islands return for that year commenced the period of limitations for assessment of any U.S. tax liability for that year.  See Appleton v. Commissioner, 140 T.C. 273 (2013).  The record provides no evidence that the Ventos agreed to extend their individual period of limitations.  Therefore, unless section 6229(a) extends the relevant period of limitations, respondent would be unable to assess the Ventos for income tax attributable to his adjustments of DTDV's 2001 partnership items.

Because respondent issued his FPAA more than three years after DTDV filed its 2001 return, the section 6229(a) period would have expired before the issuance of the FPAA unless that period was extended by the partnership's

[*15] omission of gross income. Therefore, we must determine whether DTDV omitted from its 2001 Form 1065 gross income an amount in excess of 25% of the gross income shown on the return. If so, then, under section 6229(c)(2), the section 6229(a) period remained open when respondent issued the FPAA just shy of six years after DTDV filed its 2001 return. If not, then respondent would be unable to assess any tax resulting from the FPAA adjustments and we would thus have no need to consider their merits.

C.    DTDV's Purported Section 754 Election

The question of whether DTDV omitted from its 2001 return an amount of gross income sufficient to trigger the extended period of limitations provided in section 6229(c)(2) turns on the validity of the purported section 754 election that the partnership included with its return for the prior year. According to respondent, DTDV should have reported gain of $44,375,000 from its exchange of OSI stock for cash, the partnership's full amount realized in the exchange. Because DTDV reported gain of only $32,224,697, respondent claims that DTDV's 2001 return understated the partnership's gross income by $12,150,303 ($44,375,000 – $32,224,697). Respondent calculates the total gross income

**[*16]** shown on DTDV's return as $32,229,943, a figure that petitioner does not dispute.[5] Thus, respondent concludes that the amount that DTDV omitted from its gross income exceeds 25% of the gross income shown on the partnership's return ($12,150,303 ÷ $32,229,943 = 37.7%). By contrast, petitioner defends the partnership's reporting of only $32,224,697 of gain from its exchange of OSI stock for cash. Petitioner claims that the gain reportable by the partnership was reduced by a section 743(b) adjustment of $12,150,000 allocated to Square Leg in respect of the OSI stock and a "common" partnership basis of $303.

### 1.    Elective Basis Adjustments in General

When a partner contributes property to a partnership, the partnership's basis in the contributed property and the contributing partner's basis in the partnership interest received in exchange for that property are determined by the partner's pre-contribution basis in the property. Secs. 722 and 723. Therefore, upon the formation of a partnership, the partnership's "inside" basis in its assets generally equals the aggregate of the partners' "outside" bases in their partnership interests. Subsequent events, however, can break this initial equivalence of inside and outside basis, leading to potential distortions. For example, when a transferee

---

[5]The $32,229,943 figure is the sum of the $32,224,697 of "Other income" DTDV reported, $4,769 of reported interest, and $477 of reported ordinary dividends.

[*17] purchases an interest in a partnership that holds appreciated property and takes that partnership interest with a cost basis under section 1012, the transferee partner's outside basis will exceed its share of the partnership's inside asset basis. If the partnership were to sell one or more of its appreciated properties, the share of partnership gain allocated to the transferee partner, in the absence of any basis adjustments, would include the appreciation that the partner effectively paid for when it bought its interest. As a result, the transferee partner would temporarily be subject to tax on an amount that, as to that partner, would be in economic terms a return of the partner's investment in the partnership.[6] If the partnership had an election under section 754 in effect for the year in which the transferee partner purchased its interest, however, the partnership would have allocated to that partner a basis adjustment under section 743(b) that reflected the difference between that partner's outside basis and its share of the partnership's inside basis. That basis adjustment, when apportioned among the partnership's appreciated properties, would generally prevent the transferee partner from being taxed on appreciation that the partner paid for when it purchased its partnership interest.

---

[6]Because the allocated gain would be added to the partner's outside basis, sec. 705(a)(1)(A), the "paid for" appreciation would be counted twice in that basis. Therefore, the overtaxation of the transferee partner would generally be corrected upon that partner's disposition of its interest in the partnership.

**[*18]** 2. Impact on DTDV's Gross Income of Any Section 743(b) Adjustment in OSI Stock Allocated to Square Leg

Any section 743(b) basis adjustment allocated to Square Leg in respect of the OSI stock held by DTDV would have affected the amount of gain the partnership was required to report upon the exchange of that stock for cash. If Square Leg had been properly allocated a section 743(b) adjustment in respect of the OSI stock when it bought its interest in DTDV from petitioner, that basis adjustment would have reduced Square Leg's distributive share of the partnership's gain from its sale of that stock. Under section 1.743-1(j)(2), Income Tax Regs., the partnership would first have been required to compute its overall partnership gain and allocate that gain among its partners before taking into account any section 743(b) adjustment in that stock allocated to Square Leg. But the adjustment (if positive in amount) would then serve to reduce Square Leg's distributive share of the partnership gain. Sec. 1.743-1(j)(3), Income Tax Regs. Any section 743(b) adjustments that affect a partner's distributive share of partnership income, deduction, gain, or loss "must be reflected on Schedules K and K-1 of the partnership's return". Sec. 1.743-1(j)(2), Income Tax Regs. (In general, Schedule K of Form 1065 reports the total amounts of various distributive share items of the partnership. The partnership also prepares for each partner a

[*19] Schedule K-1 that reports the partner's distributive share of the partnership items reported on Schedule K.)  Thus, any positive section 743(b) adjustment in OSI stock allocated to Square Leg should not only have reduced the distributive share of the partnership's gain from that stock reported on Square Leg's Schedule K-1; it should also have reduced the total gain reported on the partnership's Schedule K (so that the total amount reported on Schedule K would equal the sum of the distributive shares of the gain allocated to the partners on their Schedules K-1, rather than the larger amount of partnership gain determined before taking into account any positive section 743(b) adjustments).  Moreover, according to the 2001 Schedule D, Capital Gains and Losses, of Form 1065, the net long-term capital gain reported on that schedule was to be entered on the partnership's Schedule K.  If the amount shown on Schedule K would have been reduced by any positive section 743(b) adjustments and that amount had to match the gain reported on the partnership's Schedule D, it follows that the partnership should have included those adjustments in the amount reported as "Cost or other basis" on its Schedule D even though the section 743(b) adjustments would not affect the partnership's common basis in the property sold.  Sec. 1.743-1(j)(1), Income Tax Regs.

[*20] Thus, for example, if DTDV had properly allocated to Square Leg a section 743(b) adjustment of $12,150,000 in respect of the OSI stock, the partnership should have reported a basis in that stock of at least that amount on its Schedule D, resulting in a reported gain of no more that $32,225,000 ($44,375,000 –$12,150,000). Moreover, if DTDV were also correct in claiming a common basis in its OSI stock of $303, it should have reported a basis of $12,150,303. In that case, its reported gain of $32,224,697 would have been correct and DTDV would not have omitted any gross income from its 2001 return. It would be of no consequence that DTDV reported its $32,224,697 of gain as a distributive share from a lower tier partnership, rather than from the sale of property it held itself. See United States v. G-I Holdings, Inc. (In re G-I Holdings, Inc.), No. 02-3082 (SRC), 2009 WL 4911953 (D.N.J. Dec. 14, 2009). In G-I Holdings, the District Court rejected the Government's argument that the 25% test of section 6501(e)(1)(A) should be calculated item by item, so that the omission of any one item that exceeded 25% of reported gross income would have met the test. Id. at *42-*43. Instead, the court agreed with the taxpayer that the test applied on an aggregate basis, so that "the omitted amount is the difference between the amount of gross income stated in the return and the amount of gross income that should have been reported in the return." Id. at *42. Because that test looks at aggregate

**[*21]** amounts, a mischaracterization of an item of income correct in amount would be irrelevant.[7]

Respondent does not argue that, if DTDV validly made a section 754 election with its 2000 return, the section 743(b) adjustment allocated to Square Leg should have been less than $12,150,000.[8]  Instead, respondent challenges the validity of the election on the grounds that "Square Leg never held a bona fide partnership interest in DTDV."

### 3. Petitioner's Failure To Sign DTDV's Purported Section 754 Election

Section 754 allows a partnership to elect, "in accordance with regulations prescribed by the Secretary", to adjust the basis of partnership property as a result of distributions of property or transfers of partnership interests.  Section 734(b)

---

[7]Petitioner's counsel conceded at trial that DTDV had been incorrect in reporting the gain in issue as a distributive share item from lower tier LLCs rather than as gain from the sale of property that DTDV held directly.

[8]In fact, DTDV may have overstated Square Leg's sec. 743(b) adjustment in respect of the partnership's OSI stock by failing to take into account, in computing that adjustment, Square Leg's share of the partnership's claimed $303 of common basis in the stock.  See sec. 1.743-1(b)(1), Income Tax Regs. (requiring a partnership with a sec. 754 election in effect to "increase[] the adjusted basis of partnership property" in respect of a transferee partner "by the excess of the transferee's basis for the transferred partnership interest over the transferee's share of the adjusted basis to the partnership of the partnership's property").  The resulting omission of partnership gross income ($303 × .36 = $109), however, would have been far less than 25% of the partnership's reported gross income.

[*22] provides the operative rules for adjusting property as a result of distributions while section 743(b) provides the rules for adjustments resulting from transfers of partnership interests. Section 1.754-1(b)(1), Income Tax Regs., provides:

> An election under section 754 and this section to adjust the basis of partnership property under sections 734(b) and 743(b) * * * shall be made in a written statement filed with the partnership return for the taxable year during which the distribution or transfer occurs. * * * The statement required by this subparagraph shall (i) set forth the name and address of the partnership making the election, (ii) be signed by any one of the partners, and (iii) contain a declaration that the partnership elects under section 754 to apply the provisions of section 734(b) and section 743(b). * * *

In his initial posttrial briefs, respondent made two arguments in support of his claim that Square Leg was not entitled to section 743(b) adjustments. First, respondent claimed that Square Leg "did not acquire a bona-fide partnership interest in DTDV for tax purposes". Second, respondent argued that "DTDV did not make a valid § 754 election * * * because petitioner did not sign the election form included with DTDV's 2000 return."

After our trial of this case, in a notice of proposed rulemaking published in the Federal Register on October 12, 2017 (October 2017 NPRM), the Commissioner proposed to amend section 1.754-1(b)(1), Income Tax Regs., to eliminate the requirement that an election under section 754 be signed by a partner of the electing partnership. REG-116256-17, 82 Fed. Reg. 47408 (Oct. 12, 2017).

[*23] If the proposed amendments are adopted in the form proposed, they will "apply to taxable years ending on or after the date of publication of the Treasury decision adopting the[] rules as a final regulation in the Federal Register." Id. at 47409. The October 2017 NPRM, however, states that "[t]axpayers * * * may rely on this proposed regulation for periods preceding the proposed applicability date." Id. Therefore, the Commissioner will accept section 754 election statements included with timely filed partnership returns despite the failure of a partner to sign the election form if the election statement is "otherwise valid". Id.

After issuance of the October 2017 NPRM, we ordered the parties to file supplemental briefs addressing its impact on the present case. Respondent's supplemental brief states:

> In light of the issuance of the NPRM, respondent will no longer argue in this case that the lack of a signature on the election form included with DTDV's 2000 return invalidates the election, provided it is otherwise valid. However, respondent continues to maintain that there could not have been a valid "Section 754" election because Square Leg never acquired a bona-fide partnership interest in DTDV for tax purposes.[9]

_____

[9]Although it is not obvious how DTDV could have "relied" on a proposed regulation issued about 16 years after it filed its 2000 return, and after our trial of this case, we will accept respondent's concession that the absence of the signature

(continued...)

[*24] Respondent offers four alternative arguments in support of his claim that "Square Leg never held a bona fide partnership interest in DTDV". First, respondent asserts that "Square Leg did not hold [a] partnership interest in DTDV for tax purposes because it never was a member of DTDV". Second, he claims that "Square Leg's purported partnership interest in DTDV should be disregarded because it was a sham which lacked economic substance". Third, he argues that Square Leg's "partnership interest should be disregarded through the application of the step transaction doctrine". And, finally, he contends that "Square Leg's purported partnership interest violates the partnership anti-abuse regulations." For the reasons explained below, we conclude that none of respondent's arguments justifies disregarding Square Leg as a partner in DTDV. Respondent accepts that, if the interest in DTDV that petitioner assigned to Square Leg is recognized as a bona fide partnership interest, then, in the light of the October 2017 NPRM, DTDV made a valid section 754 election with its 2000 return, despite petitioner's failure to sign the election statement. Respondent further accepts that, if the partnership's section 754 election was valid, then DTDV did not omit from its 2001 return an amount of gross income in excess of 25% of its reported gross

[9](...continued)
of petitioner or another partner from the purported sec. 754 election that DTDV included with that return did not invalidate the election.

[*25] income.  Therefore, on the basis of our conclusion that Square Leg acquired a bona fide partnership interest in DTDV, we further conclude that the period of limitations described in section 6229(a) expired before respondent issued his FPAA in this case.  Thus, we will not consider further the merits of the FPAA adjustments or respondent's determination of penalties but will instead enter decision for petitioner.

II.     Square Leg's Status as a "Member" of DTDV

A.     The Parties' Arguments

Colo. Rev. Stat. Ann. sec. 7-80-702(1) (West, Westlaw through Laws 1994, S.B. 94-107) provides that, while a member of a limited liability company can transfer or assign the member's interest, the transferee cannot participate in management or become a member of the entity unless all of the members other than the transferor approve the proposed transfer or assignment by unanimous written consent.  Respondent argues that, because Lana did not consent to petitioner's assignment to Square Leg of part of his interest in DTDV, Square Leg never became a "member" of DTDV.

Petitioner first disputes the premise of respondent's argument, claiming that Lana did provide the consent to the assignment required by Colo. Rev. Stat. Ann. sec. 7-80-702(1).  He asks us to infer from the representation and warranty he

[*26] made to Square Leg in the purchase agreement governing the assignment that the "conditions that needed to be satisfied to effect the transfer * * * were satisfied." Petitioner also notes the reference in the assignment document he executed to a "company meeting" of DTDV on November 24, 2000, at which all of its members approved the assignment.

Second, petitioner argues that, even if Lana's failure to consent to the assignment in writing prevented Square Leg from becoming a member of DTDV, Square Leg was nonetheless entitled, under Colo. Rev. Stat. Ann. sec. 7-80-702(1), to all of the economic rights associated with the "LLC Interest". Although the recipient of an interest in an LLC by a transfer that does not receive the required consent from nontransferor members cannot participate in management or become a member, the transferee is nonetheless "entitled to receive the share of profits or other compensation by way of income and the return of contributions to which * * * [the transferor] member would otherwise be entitled." Colo. Rev. Stat. Ann. sec. 7-80-702(1). Petitioner observes that a person can be recognized as a partner in a partnership for Federal income tax purposes, by reason of that person's economic interest in the entity, even if the person is not recognized as a partner under applicable local law.

**[\*27]** B.    Analysis

We need not resolve the parties' factual dispute concerning whether Lana gave her written consent to petitioner's assignment of part of his interest in DTDV. We agree with petitioner that, under Colo. Rev. Stat. Ann. sec. 7-80-702(1), even if Lana's failure to consent to the assignment in writing prevented Square Leg from becoming a member of DTDV, Square Leg would nonetheless have been entitled to economic rights inherent in the assigned interest sufficient to allow it to be recognized as a partner for Federal income tax purposes.

The redemption of Square Leg's interest in DTDV in exchange for distributions totaling $15,975,000 demonstrates that Square Leg acquired sufficient economic rights to be treated as a partner of DTDV.  Section 704(e)(1) provides:  "A person shall be recognized as a partner for purposes of this subtitle if he owns a capital interest in a partnership in which capital is a material income-producing factor, whether or not such interest was derived by purchase or gift from any other person."  And section 1.704-1(e)(1)(v), Income Tax Regs., provides:  "For purposes of section 704(e), a capital interest in a partnership means an interest in the assets of the partnership, which is distributable to the owner of the capital interest upon his withdrawal from the partnership or upon liquidation of the partnership."  Thus, Square Leg's receipt of $15,975,000 in redemption of its

[*28] interest in DTDV demonstrates that it had a capital interest in the partnership. And there can be no doubt that capital was a material income-producing factor in DTDV. Indeed, the record provides no evidence that DTDV received any income attributable to the services of its partners or any employees. Consequently, section 704(e)(1) requires us to recognize Square Leg as a partner in DTDV.

Because Square Leg held economic rights in DTDV sufficient for it to be recognized as a partner for Federal income tax purposes, regardless of whether it was recognized as a "member" under Colorado law, the factual question of whether Lana consented in writing to petitioner's assignment to Square Leg of part of his interest in DTDV is immaterial. Even if Lana did not provide the consent required by Colo. Rev. Stat. Ann. sec. 7-80-702(1) for Square Leg to become a member, Square Leg's ownership of an interest in DTDV's capital requires that we recognize it as having been a partner in DTDV before June 8, 2001, when the partnership completed its redemption of Square Leg's interest.

III.    Economic Substance Doctrine

A.    Respondent's Arguments

Respondent makes various claims in support of his argument that Square Leg's interest in DTDV should be disregarded as a sham:

**[*29]** [T]here was no business purpose for petitioner adding Square Leg as a partner in DTDV other than tax avoidance. Petitioner testified at trial that he transferred an interest in DTDV to Square Leg for "estate planning purposes", which is a personal purpose rather than a business purpose. * * * Square Leg provided nothing of value to DTDV as it provided no capital, loans or services to DTDV or anything else. * * * It didn't even pay petitioner for the interest in DTDV it allegedly purchased from him. * * * Instead, petitioner terminated Square Leg's interest in DTDV only six months after it was created * * *.

Further, respondent renews his claims that Square Leg did not have sufficient economic rights in DTDV to be recognized as a partner:

Square Leg had no independent rights to receive any income distributions from DTDV or any of its assets. * * * Instead, petitioner had unlimited discretion to determine whether to distribute any of DTDV's income or assets to Square Leg. * * * Compounding this lack of economic purpose, Square Leg promised to make the annuity payments due to petitioner under the purchase agreement regardless of whether it received any income from DTDV or the value of its interest in DTDV. * * *

Respondent also emphasizes Square Leg's relationship with petitioner:

Square Leg was not an independent entity separate from petitioner but, instead, was a shell entity created by Lighthouse in conjunction with petitioner's life insurance policy, which held the funds that DTDV had transferred to it as investment assets of that policy. * * * Petitioner benefitted from these assets as both the death benefit payable under his life insurance policy and the cash value of petitioner's insurance policy were based upon the appreciation of these assets over time. * * *

**[\*30]** Similarly, respondent alludes to an alleged "circular nature of the flow of funds from DTDV to Square Leg and Richard's life insurance policy". According to respondent, that circularity "allowed petitioner to continue to benefit from the funds after they were transferred to Square Leg by having rights to withdraw the cash value of his life insurance policy and borrow against it."

B.     Petitioner's Response

In countering respondent's economic substance argument, petitioner claims that "[e]state planning, retirement planning, asset protection and wealth management are legitimate business purposes" for selling a partnership interest. Petitioner contends that "there is considerable evidence supporting a number of nontax business purposes" for his sale of part of his DTDV interest to Square Leg, "including, among others, to provide a lifetime income stream under the private annuity payments." He also accuses respondent of "completely disregard[ing] more than 70 years of precedent, including respondent's own rulings, that recognize private annuities as bona fide consideration in sale transactions."

Petitioner challenges respondent's assertion that a partner's acquisition of a partnership interest by purchase without contributing capital to the partnership can support disregarding that interest. In particular, petitioner claims that, under section 1.704-1(b)(2)(iv)(<u>1</u>), Income Tax Regs., his "capital account associated

**[*31]** with the 36 percent interest in DTDV was transferred to Square Leg as a result of Square Leg's purchase of such interest."  Petitioner adds:

> There is absolutely no additional requirement that Square Leg contribute capital to DTDV, and the regulations expressly provide that capital contributions associated with the purchased partnership interest transfer to Square Leg.  Thus, there is no legal or factual support for respondent's contention that Square Leg should not be considered a partner of DTDV because it did not contribute any capital to DTDV.

Petitioner does not deny Square Leg's default on its annuity obligation but notes that that default was unexpected and resulted in his receipt of money damages.

Regarding respondent's characterization of Square Leg as a "temporary partner", petitioner asserts that the redemption of Square Leg's interest in DTDV was not contemplated when Square Leg acquired that interest.  According to petitioner, section 1.701-2(d), Example (7), Income Tax Regs., demonstrates that a partner can be treated as a temporary or transitory partner only when a plan for the redemption of that partner exists "at the outset".

Petitioner also challenges respondent's claim that Square Leg had no right to distributions from DTDV.  Petitioner acknowledges that, as DTDV's manager, he could determine the timing of any distributions by the entity.  Petitioner goes on to argue, however, that any distributions declared would have to "be distributed

[*32] ratably over the membership interests in accordance with state law." Petitioner refers to Colo. Rev. Stat. Ann. sec. 7-80-504, which provides: "Distributions of cash or other assets of a limited liability company shall be allocated among the members and among classes of members on the basis of the value, as stated in the limited liability company records * * * of the contributions made by each member." Petitioner argues that Square Leg, "[a]s a transferee of * * * [his] interest in DTDV," was entitled under Colo. Rev. Stat. Ann. secs. 7-80-503, 7-80-504, and 7-80-702 "to profits, losses and distributions in accordance with the value of * * * [his] contributions commensurate with its 36 percent interest."

Petitioner rejects respondent's claim regarding Square Leg's lack of independence as "simply not true." Petitioner points out that "Square Leg was created and owned by Lighthouse," which he characterizes as an "independent" insurance company.

Finally, petitioner argues that the alleged "circularity" resulting from his ability to receive distributions or loans from his insurance policy "proves nothing", because that ability arises from a common, if not necessary, feature of permanent life insurance policies. Petitioner also notes that he did not exercise his right to receive policy loans or distributions. In addition, petitioner claims that his transfer

[*33] to Square Leg of part of his interest in DTDV "did not increase the cash surrender value or death benefit of the Lighthouse policy since the private annuity obligation created an offsetting liability such that there was no increase in the value of the policy."

C.    Analysis

The economic substance doctrine, properly understood, is a tool of purposive interpretation that allows courts to override the results of a literal application of the relevant rules if those results are manifestly contrary to the rules' purposes.  As the Court of Appeals for the Federal Circuit explained in Coltec Indus., Inc. v. United States, 454 F.3d 1340, 1353 (Fed. Cir. 2006):  "The economic substance doctrine represents a judicial effort to enforce the statutory purpose of the tax code."  "In this regard," the court added, "the * * * doctrine is not unlike other canons of construction that are employed in circumstances where the literal terms of a statute can undermine the ultimate purpose of the statute."  Id. at 1354.  Thus, in the words of the Supreme Court opinion on which the doctrine rests, we ask whether what was done was "the thing which the statute intended."  See Gregory v. Helvering, 293 U.S. 465, 469 (1935).  In particular, in this partnership case, we ask whether Square Leg's participation in DTDV enabled petitioner to achieve a tax benefit contrary to congressional intent.

[*34] Considering the application of the economic substance doctrine in the present case requires that we first identify the tax benefit in issue. Respondent frames the issue as follows:

> Petitioner's real reason for adding Square Leg as a partner in DTDV was tax avoidance which he attempted to accomplish by allocating income to Square Leg as a partner in DTDV, prior to its being taxed by respondent, and by claiming an inflated basis in DTDV's OSI stock by asserting that Square Leg's purported purchase of a partnership interest in DTDV entitled it to claim a section 754 basis election. By doing this, petitioner sought to avoid tax on this income while at the same time using this untaxed income to fund his annuity/life insurance policy purchased for personal purposes.

In short, respondent alleges that petitioner's allocation of gain to Square Leg was somehow improper and that any section 743(b) adjustment allowed as a result of Square Leg's acquisition of its interest would be an inappropriate "inflation" of basis.

We can readily dismiss respondent's concern about basis inflation. DTDV was required to allocate the partnership gain from its sale of OSI stock among its members before taking into account any section 743(b) basis adjustment in that stock to which Square Leg might have been entitled. See sec. 1.743-1(j)(2), Income Tax Regs. Any allocation of partnership gain to Square Leg would reduce dollar-for-dollar the share of that gain allocable to other partners (including

[*35] petitioner or Lana), without regard to whether Square Leg's share of the gain was then reduced by a section 743(b) basis adjustment in the OSI stock.

The mere fact that any gain allocated to Square Leg reduced the gain allocable to petitioner and Lana does not establish that DTDV's allocation of gain to Square Leg was improper. Respondent makes no argument that DTDV's allocation to Square Leg of $15,974,891 of partnership gain was inconsistent with the parties' economic arrangement. Indeed, Square Leg's distributive share of that gain after taking into account the section 743(b) basis adjustment the partnership allocated to Square Leg ($15,974,891 − $12,150,000 = $3,824,891) roughly equals the excess of the proceeds it received in the redemption of its interest over the stated purchase price of that interest ($15,975,000 − $12,150,000 = $3,825,000).[10] Respondent does argue that "DTDV's allocation of income from the OSI stock sale to Square Leg violated the assignment of income doctrine." But he does not contend that the assignment of income doctrine requires that we disregard Square Leg's ownership of an interest in DTDV. If, when petitioner

---

[10]The $109 discrepancy between the $3,824,891 of gain that DTDV allocated to Square Leg as a result of its sale of OSI stock and the excess of the redemption proceeds Square Leg received over the purchase price of its interest results from DTDV's failure, when computing the sec. 743(b) adjustment it allocated to Square Leg in respect of that stock, to take into account Square Leg's share of the partnership's claimed $303 common basis in the stock ($109 = $303 × .36).

**[*36]** assigned to Square Leg part of his interest in DTDV, completion of Agilent's acquisition of OSI was a "practical certainty", we could apply the assignment of income doctrine to prevent the shift in gain from petitioner to Square Leg. See Jones v. United States, 531 F.2d 1343, 1345 (6th Cir. 1976). But petitioner could not have shifted to Square Leg gain of more than $3,825,000. The remaining $12,149,891 of partnership gain that DTDV allocated to Square Leg duplicated gain that petitioner realized on his assignment to Square Leg of part of his interest in DTDV. Therefore, even if the factual premise on which respondent invokes the assignment of income doctrine were correct, that doctrine would not give us reason to disregard altogether Square Leg's interest in DTDV.

Of course, while petitioner realized gain on his assignment to Square Leg equal to the excess of $12,150,000 over an allocable portion of his basis in his DTDV interest (if any), petitioner apparently did not take any of that realized gain into account for 2000. His assignment of part of his DTDV interest in exchange for an annuity appears to have been intended to allow him to defer the tax payable on that exchange. If respondent believes that petitioner's receipt of an annuity from Square Leg did not entitle him to deferral, respondent should have determined a deficiency in petitioner's 2000 individual income tax. The timing of petitioner's recognition of gain from his assignment to Square Leg of part of his

[*37] interest in DTDV is not a partnership item subject to redetermination in this proceeding.[11]

Petitioner's right to benefit from Square Leg's assets might have affected his ability to avoid attribution to him of Square Leg's supposed share of DTDV's gain resulting from Agilent's acquisition of OSI. In his pretrial memorandum, respondent claimed that, because petitioner "controlled the assets in Square Leg's account" he "should be treated as owning * * * [those assets] under the investor control doctrine."[12] At trial, however, respondent's counsel stated that "[t]he

---

[11]Petitioner assures us that "[t]he use of private annuities as a well-recognized tax and estate planning tool has been around for at least 60 to 70 years, and respondent's own ruling[s] recognize the validity of private annuities." But the history of the taxation of exchanges of appreciated property for "private" annuities has not been as irenic as petitioner suggests. Early caselaw gave open transaction treatment to an exchange of appreciated property for a private annuity, e.g., Lloyd v. Commissioner, 33 B.T.A. 903 (1936), but subsequent authorities reduced the potential deferral benefit of private annuities, see, e.g., Estate of Bell v. Commissioner, 60 T.C. 469 (1973) (requiring gain to be taken into account at time of exchange when annuity is sufficiently secured); Rev. Rul. 69-74, 1969-1 C.B. 43 (denying open transaction treatment and requiring ratable gain recognition as annuity payments received). More recently, in 2006, the Commissioner proposed amendments to the regulations under sec. 1001 that, if adopted as proposed, would require immediate gain recognition upon an exchange of appreciated property for a private annuity--regardless of the security supporting the annuity payments. REG-141901-05, 71 Fed. Reg. 61441 (Oct. 18, 2006).

[12]The record does not provide details about the extent to which petitioner could control the investment of Square Leg's assets, but we infer from the circumstances that he was not without influence. We find it difficult to imagine

(continued...)

**[*38]** investor control doctrine is not really a part of this case". Respondent makes

no argument on brief that petitioner should be treated under the investor control

doctrine as owning the assets held by Square Leg. Respondent's concession may

reflect not the merits of any arguments under the investor control doctrine, cf.

Webber v. Commissioner, 144 T.C. 324, 367-368 (2015) (applying the investor

control doctrine to treat the insured under another Lighthouse-issued policy as

owning assets held in a segregated investment account in support of that policy),

but instead respondent's doubts about whether petitioner's constructive ownership

of Square Leg's assets is a partnership item subject to redetermination in the

present case.[13] In any event, the record does not allow us to determine whether

---

[12](...continued)
why Square Leg, acting entirely on its own behalf, would choose to purchase an interest in DTDV in exchange for an annuity measured by Lana's life.

[13]If petitioner had assigned his entire interest in DTDV to Square Leg, the question of whether he or Square Leg should be treated as the owner of the purportedly assigned interest would clearly not be a partnership item. See Grigoraci v. Commissioner, T.C. Memo. 2002-202. In that event, the total partnership gain and the separate shares of that gain would have been given. The only question would have been the identity of the partner to whom a particular distributive share should have been allocated. But petitioner assigned only part of his interest. Therefore, the question of whether he should be treated as the owner of Square Leg's assets would affect the shares into which the partnership gain should be allocated. In other words, the issue would be not just who is entitled to receive a particular piece of pie but also the portions into which the pie is to be cut. The potential impact on the partnership's allocation of gain makes it more

(continued...)

**[*39]** petitioner would properly be treated under the investor control doctrine as owning the assets held by Square Leg.

Respondent's specific economic substance claims fail to identify any tax avoidance that would justify disregarding Square Leg's interest in DTDV as a sham. First, respondent's attempted differentiation between "business" and personal estate planning purposes has no bearing on the present case.[14] Respondent's argument suggests that any measures undertaken for estate planning purposes must be disregarded as "shams". In applying the economic substance doctrine, the relevant substantive question is whether the taxpayer had a purpose other than obtaining tax benefits manifestly inconsistent with congressional intent. Measures undertaken for estate planning purposes, while perhaps deserving of closer scrutiny than measures undertaken for business purposes wholly unrelated to tax, are not necessarily inconsistent with congressional intent. Petitioner,

---

[13](...continued) likely that the question of ownership of the purportedly assigned interest is a partnership item. See Alpha I, L.P. v. United States, 682 F.3d 1009 (Fed. Cir. 2012).

[14]Respondent may have in mind a distinction between corporate and shareholder purposes drawn by regulations under sec. 355 regarding corporate divisions. See sec. 1.355-2(b)(2), Income Tax Regs. ("A shareholder purpose (for example, the personal planning purposes of a shareholder) is not a corporate business purpose.").

[*40] however, has hardly been specific in articulating his purposes for assigning to Square Leg part of his interest in DTDV in exchange for payments measured by the life of his spouse. We doubt that petitioner was unaware of the potential income tax consequences of that assignment. Thus, we infer that he made the assignment with the intent at least of deferring when he would be required to take into account part of the gain he would otherwise have recognized as a result of Agilent's acquisition of OSI. It may also be that the purchase agreement between petitioner and Square Leg undervalued the assigned interest by deriving the stated purchase price from a market price of OSI stock that did not yet reflect a pending acquisition of which petitioner would have been well aware.[15] Again, however, the propriety of the deferral benefit--the enjoyment of which did not require the use of a tax partnership--is beyond the scope of this partnership-level proceeding.

---

[15]The $13.50 per-share price of OSI stock at the close of the NASDAQ on November 24, 2000, did not reflect the execution of agreements by OSI and Agilent later that day that provided for Agilent's acquisition of OSI stock for $17.75 per share. The $17.50 per-share price that Mr. Line received for OSI stock on November 28, 2000, once the market had "priced in" expectations of the acquisition, suggests a very high level of confidence in its completion. The record does not establish whether petitioner and Square Leg executed their purchase agreement before or after Agilent and OSI agreed to the planned corporate acquisition. If petitioner and Square Leg did not execute their purchase agreement until after OSI and Agilent had executed their agreements, the stated price of the assigned interest in DTDV would have understated its true value, resulting in an impermissible assignment of income.

[*41] To the extent that petitioner sought not only to defer tax on his gain but also to shift part of that gain to Square Leg, effectively making a pretax contribution to his insurance policy, he was pursuing a tax benefit that was not "the thing which the statute intended." But any motive by petitioner to shift gain would not justify our disregarding Square Leg's interest in DTDV altogether as a sham. Instead, we could prevent any inappropriate shifting of gain by applying the assignment of income doctrine to reallocate from Square Leg to petitioner $3,825,000 of the partnership gain from DTDV's sale of OSI stock.

Second, Square Leg's failure to invest directly in DTDV does not render its interest a sham. As noted above, Square Leg's receipt of $15,975,000 in redemption of its interest indicates that it acquired an interest in DTDV's capital.[16]

_____

[16]Square Leg's interest in DTDV need not have been evidenced by a capital account. The capital account maintenance rules provided in sec. 1.704-1(b)(2)(iv), Income Tax Regs., merely provide a safe harbor under which allocations of distributive share items provided in a partnership agreement will be respected for tax purposes. Because petitioner failed to introduce DTDV's operating agreement or any testimony describing its terms, we do not know whether that agreement provided for the maintenance of capital accounts. Contrary to petitioner's suggestion, however, the regulations do not create capital accounts--nor do they provide for the transfer of a capital interest in a partnership upon the transfer of a partnership interest. Sec. 1.704-1(b)(2)(iv)(l), Income Tax Regs., on which petitioner relies, provides: "The capital accounts of partners will not be considered to be determined and maintained in accordance with the rules of this paragraph (b)(2)(iv) unless, upon the transfer of all or a part of an interest in the partnership, the capital account of the transferor that is attributable to the

(continued...)

**[\*42]** The bona fides of Square Leg's interest in the partnership does not depend on whether Square Leg acquired that interest by means of its own direct investment of capital in the partnership or instead by purchase. See sec. 704(e)(1).

Third, we do not view Square Leg's apparent default on its annuity obligation as evidence that its acquired interest in DTDV was a sham. The amount of gain petitioner realized from his assignment to Square Leg and when he took that gain into account are not partnership items subject to redetermination in this proceeding.

Fourth, the brevity of Square Leg's investment in DTDV is not, of itself, sufficient reason to disregard that investment as a sham. Cf. Compaq Computer Corp. v. Commissioner, 277 F.3d 778, 780 (5th Cir. 2001) (respecting transaction

---

[16](...continued)
transferred interest carries over to the transferee partner." The regulation does not provide for an automatic transfer of a capital account balance. Instead, it provides that any provisions regarding the maintenance of capital accounts included in the partnership agreement do not meet the requirements of sec. 1.704-1(b)(2)(iv), Income Tax Regs., unless they provide for such a transfer. The capital account balances reported on DTDV's Forms 1065 suggest that it did not maintain capital accounts in a manner that complied with the regulations: Those balances appear to reflect claimed tax basis in the OSI stock rather than the stock's value. See sec. 1.704-1(b)(2)(iv)(b), (d)(1), Income Tax Regs. (requiring that a partner's capital account be credited with the fair market value of property contributed by the partner to the partnership). Square Leg's succession to part of petitioner's capital interest in DTDV is thus demonstrated not by the regulation on which petitioner seeks to rely but instead on the economic realities attendant to the redemption of Square Leg's interest.

**[*43]** in which taxpayer bought securities and "immediately sold * * * [them] back to the seller"), rev'g 113 T.C. 214 (1999); IES Indus., Inc. v. United States, 253 F.3d 350, 352 (8th Cir. 2001) (reaching same result on similar facts, when purchase and sale occurred "within hours" of each other). All else being equal, investments of shorter duration may be more susceptible to sham treatment than longer term investments. But even brief investments cannot be disregarded as shams unless doing so is required to implement clearly defined congressional policies. Again, respondent has offered us no reason disregarding Square Leg's interest in DTDV as a sham is necessary to prevent unwarranted tax avoidance.

Fifth, even if respondent were correct that Square Leg was entitled to distributions from DTDV only to the extent that petitioner authorized them, the absence of a fixed right to distributions would not justify disregarding Square Leg's interest in the partnership.[17] If a partnership's managers use discretion

---

[17]Petitioner has not established that Square Leg would have been entitled to 36% of any distributions made by DTDV. In the absence of a contrary provision in DTDV's operating agreement, the applicable Colorado statute would have required distributions to be allocated in proportion to members' contributions. Colo. Rev. Stat. Ann. sec. 7-80-504 (West, Westlaw through Laws 1994, S.B. 94-107). While the statute does not expressly provide that transferee members step into the shoes of their predecessors in regard to contributions, it strikes us as unlikely that the statute, if not overridden by an LLC's operating agreement, would be interpreted to deny a purchaser of an interest in the LLC any share of partnership distributions. Even assuming that the statutory apportionment rule

(continued...)

[*44] granted them in the partnership agreement to forgo current distributions, the value of each member's interest would increase by the member's share of any undistributed income. Therefore, a member's failure to receive current distributions would not evidence the member's lack of an economic interest in the entity.

Sixth, while petitioner's economic interest in Square Leg's assets might be germane to the validity of his purported transfer to Square Leg, we do not view his relationship with Square Leg as relevant to the validity of the transferred interest. Petitioner acknowledges that his policy with Lighthouse was "a variable policy" whose value "varied depending on the segregated account investment reserves, which were held by Square Leg." Petitioner also acknowledges that his policy allowed him to receive policy loans and distributions of cash surrender value. Thus, while the record provides no evidence that petitioner had a relationship with Lighthouse other than as an insured under one of its policies, it does not follow that Square Leg was also independent from petitioner. When petitioner transferred part of his interest in DTDV to Square Leg, he remained an economic beneficiary

_____

[17](...continued)
would be interpreted to treat transferees as successors of their predecessors in regard to capital contributions, we do not know the extent to which any operating agreement governing DTDV overrode the default rule provided in the statute.

**[*45]** of the transferred interest. (Were that not the case, we doubt he would have been willing to assign his interest to Square Leg for a price that did not reflect the value of Agilent's expected acquisition of OSI.) But respondent apparently accepts that petitioner's economic interest in Square Leg's assets was insufficient to treat him as the owner of those assets for Federal income tax purposes. We thus do not view petitioner's relationship with Lighthouse and Square Leg as grounds for disregarding Square Leg's interest in DTDV.

Respondent's "circular cash flow" argument is simply another manifestation of his argument about the relationship between petitioner and Square Leg. In fact, the flow of funds that respondent describes--from DTDV to Square Leg to (potentially) petitioner--is not circular. The funds that ended up with Square Leg did not originate with it, nor did the funds distributed by DTDV to Square Leg return to the partnership. Semantic quibbles aside, respondent's circular cashflow argument simply directs our attention to petitioner's economic interest in Square Leg's assets. The prospect that any economic benefits from the DTDV interest transferred by petitioner to Square Leg might ultimately redound to petitioner's benefit does not require disregarding that interest as a sham.

For the reasons explained above, we are unconvinced that the economic substance doctrine justifies disregarding Square Leg's interest in DTDV altogether

**[*46]** as a sham.  The prospect that petitioner's assignment of part of his interest in the partnership to Square Leg may have shifted economically "ripe" gain is the only possible respect in which the results of the transactions in issue, as reflected in DTDV's partnership items, may not have been "the thing which the statute intended."  But respondent makes no argument that the assignment of income doctrine requires disregarding Square Leg's interest in DTDV as a sham.  Any inappropriate assignment of income could be redressed, without disregarding Square Leg's status as a partner, simply by reallocating to petitioner part of the partnership gain from DTDV's sale of OSI stock that DTDV reported as allocable to Square Leg.  Respondent has not identified any other potential abuse that could be corrected only by disregarding Square Leg's interest in DTDV and reallocating to petitioner all of the partnership gain that DTDV allocated to Square Leg.  As noted above, $12,149,891 of the partnership gain that DTDV allocated to Square Leg duplicated gain petitioner realized separately as a result of his assignment to Square Leg.  Requiring petitioner to recognize that gain as an increased share of partnership gain for 2001 would deny him the benefit of any deferral as a result of his receipt of an annuity from Square Leg as consideration for the assigned interest.  Because the timing of petitioner's recognition of gain from his assignment to Square Leg is not a partnership item subject to redetermination in

**[\*47]** this proceeding, we do not view any question about the propriety of the deferral benefit petitioner sought as grounds to disregard Square Leg's interest in DTDV.

IV.   The Step Transaction Doctrine

A.   The Parties' Arguments

Respondent does not fully develop his argument that we "should apply the step transaction doctrine to disregard Square Leg's purported partnership interest." Instead, he rests his argument on the invocation of familiar buzzwords, claiming that the series of transactions that included petitioner's assignment to Square Leg of part of his interest in DTDV and the partnership's redemption of that interest about six months later "were part[s] of an overall 'tax plan'" directed to a single "end result".  Therefore, respondent asks us to "determine that, in substance, DTDV merely transferred taxable proceeds that it had previously earned from its OSI stock sale into a life insurance policy owned by petitioner", without giving effect to Square Leg's ownership of an interest in DTDV.  Respondent does not explain why DTDV would transfer funds into petitioner's life insurance policy.  Presumably, respondent's proposed step transaction recast would include a distribution by DTDV to petitioner of the $15,975,000 that the partnership actually

[*48] distributed to Square Leg, followed by petitioner's transfer of those funds into his insurance policy.

Petitioner counters respondent's step transaction argument by challenging the argument's factual premise, claiming that, when Square Leg acquired its interest in DTDV, no plan existed to redeem that interest.

B.     Analysis

The parties' competing claims regarding the step transaction doctrine, like those about the economic substance of Square Leg's interest in DTDV, miss the forest for the trees.  While a plan to redeem Square Leg's interest in DTDV at the time of its acquisition might be a necessary condition to applying the step transaction doctrine, it is not sufficient.  The step transaction doctrine, like the economic substance doctrine from which it is derived, is simply a tool of purposive interpretation allowing for the recharacterization of related transactions, as appropriate, so that the tax consequences of the transactions are consistent with congressional intent.  Even if respondent had met his burden of proving that petitioner's assignment to Square Leg inappropriately shifted $3,825,000 of partnership gain from DTDV's sale of OSI stock, respondent's allegations about overall plans and end results would offer us no explanation of why we should disregard Square Leg's interest in DTDV altogether.  The incremental effect of

**[\*49]** disregarding Square Leg's interest would be to reallocate from Square Leg to petitioner the remaining $12,149,891 of partnership gain that DTDV allocated to Square Leg--gain that duplicates the gain that petitioner realized outside the partnership as a result of the assignment. Again, the principal consequence of reallocating that portion of the partnership gain to petitioner would be to deny him any deferral benefits from his receipt of an annuity as consideration for the assigned interest. And if respondent views those deferral benefits as improper, he should have determined a deficiency in petitioner's individual income tax for 2000.

V.    The Partnership Anti-Abuse Regulation

Section 1.701-2, Income Tax Regs., while captioned "Anti-abuse rule", actually provides two separate rules. The first, which might be called the "'abuse-of-subchapter-K rule", provides:

> [I]f a partnership is formed or availed of in connection with a transaction a principal purpose of which is to reduce substantially the present value of the partners' aggregate federal tax liability in a manner that is inconsistent with the intent of subchapter K, the Commissioner can recast the transaction for federal tax purposes, as appropriate to achieve tax results that are consistent with the intent of subchapter K, in light of the applicable statutory and regulatory provisions and the pertinent facts and circumstances. * * *

**[\*50]** Sec. 1.701-2(b), Income Tax Regs. Among the possible "recasts" envisioned by the regulations are disregarding a "purported" partner's status as a partner and reallocating "[t]he partnership's items of income, gain, loss, deduction, or credit". Id. subparas. (2), (4).

Applying the abuse-of-subchapter-K rule requires comparing the manner in which one or more taxpayers seek to use a partnership to reduce their tax liabilities with "the intent of subchapter K". Tax avoidance efforts can trigger the application of the rule only when the tax reduction sought is "inconsistent with the intent of subchapter K". Sec. 1.701-2(b), Income Tax Regs. Thus, the intent of subchapter K serves as a reference point in applying the rule. To aid in that application, section 1.701-2(a), Income Tax Regs., lists three "requirements" described as "[i]mplicit in the intent of subchapter K":

> (1) The partnership must be bona fide and each partnership transaction or series of related transactions * * * must be entered into for a substantial business purpose.

> (2) The form of each partnership transaction must be respected under substance over form principles.

> (3) Except as otherwise provided in this paragraph (a)(3), the tax consequences under subchapter K to each partner of partnership operations and of transactions between the partner and the partnership must accurately reflect the partners' economic agreement and clearly reflect the partner's income. * * *

[*51] A failure to properly reflect income may be excused if the distortion is "clearly contemplated" by the relevant substantive provision.  Sec. 1.701-2(a)(3), Income Tax Regs.

The second anti-abuse rule, which may be called the "abuse-of-entity-treatment rule", allows the Commissioner to "treat a partnership as an aggregate of its partners in whole or in part * * * to carry out the purpose of any provision of the Internal Revenue Code or the regulations promulgated thereunder." Id. para. (e)(1).

A.    The Parties' Arguments

Respondent claims that the partnership anti-abuse regulation of section 1.701-2, Income Tax Regs., allows him to "disregard Square Leg's purported purchase of a 'partnership' interest in DTDV".  He does not explain in detail how he would recast the relevant transactions to disregard Square Leg's interest in DTDV or how the conditions of the regulation allow for any such recast.  Instead, he simply repeats allegations he makes in other contexts about allegedly troubling aspects of the transactions in issue:

> The parties were all related as Square Leg was nothing more than a
> shell entity existing as part of petitioner's life insurance policy.  * * *
> Square Leg did not hold any economic interest in DTDV as it
> contributed nothing to DTDV and had no independent rights to
> receive any of its income or assets.  * * *  Thus, there was no

[*52] business purpose for adding Square Leg as a partner in DTDV. Instead, Square Leg was merely a temporary "partner" holding only a nominal interest in DTDV which was created for the sole purpose of reducing Richard and Lana's aggregate tax liability flowing from DTDV.

In response to respondent's invocation of the partnership anti-abuse regulation, petitioner claims summarily: "The record shows that Square Leg was a bona fide entity, that it was a partner in DTDV, that there was a business purpose for adding Square Leg as a partner, that Square Leg was not a temporary partner and that Square Leg was not created for the sole purpose of reducing Richard Vento's and Lana Vento's aggregate tax liability flowing from DTDV."

B.    Analysis

Our rejection of respondent's economic substance and step transaction arguments to disregard Square Leg's interest in DTDV counsels a degree of wariness in allowing him to rely on the partnership anti-abuse regulation to accomplish that same result. The preamble to the regulation addressed comments that "questioned the relationship between the regulation and established legal doctrines, such as the business purpose and substance over form doctrines (including the step transaction and sham transaction doctrines)". T.D. 8588, 1995-1 C.B. 109, 112. In large part, the regulation simply confirms that "[p]artnerships, like other business arrangements, are subject to those doctrines." Id. Moreover,

**[*53]** the preamble acknowledges that "the fundamental principles reflected in the regulation are consistent with the established legal doctrines". Id. Therefore, an interpretation of the regulation that would allow a recast not supported by any of the legal doctrines would be questionable.

Respondent encounters the same stumbling block in asserting the anti-abuse regulation that hindered his efforts to apply the underlying legal doctrines. He offers us no good reason to reallocate from Square Leg to petitioner more than $3,825,000 of DTDV's partnership gain from its sale of DTDV stock.

Turning to the terms of the abuse-of-subchapter K rule provided in section 1.701-2(b), Income Tax Regs., we will assume for the sake of argument that petitioner's assignment to Square Leg of part of his interest in DTDV had as at least one of its principal purposes reducing substantially the present value of the Ventos' Federal tax liability. Had petitioner not engaged in the transactions in issue, he would have recognized almost $16 million more gain in 2001 from Agilent's acquisition of OSI than he and Lana reported. It would be unrealistic to assume that those potential tax savings had no influence on petitioner's actions.

But a principal purpose of achieving tax savings by means of a transaction involving a partnership is not a sufficient condition for applying the abuse-of-subchapter-K rule. The manner in which those tax savings are sought must be

[*54] "inconsistent with the intent of subchapter K".  That implicates the three

requirements that the regulation identifies as implicit in the intent of subchapter K.

Sec. 1.701-2(a), Income Tax Regs.  We have already rejected respondent's claim

that substance over form principles justify disregarding the form of the

transactions in issue (the second requirement).  Because of petitioner's failure to

introduce DTDV's operating agreement, section 704 would allow an allocation to

Square Leg of a portion of the gain in issue only to the extent that the allocation

would be consistent with Square Leg's economic interest.  Therefore, the

allocation to Square Leg of whatever portion of that gain would be allowed by

section 704 would by definition "accurately reflect the partners' economic

arrangement and clearly reflect the partners' income" (the third requirement).[18]

That leaves the first requirement implicit in subchapter K:  the business

purpose for the partnership and its transactions.  Again, petitioner has been vague

in articulating specific business purposes for the formation of DTDV and his

exchange with Square Leg.  But respondent bears the burden of proving an

omission from gross income sufficient to trigger section 6229(c)(2).  See Rule

---

[18]As noted above, the $3,824,891 of partnership gain from DTDV's sale of OSI stock that the partnership allocated to Square Leg roughly equals the excess of the proceeds it received in redemption of its interest over the stated purchase price of that interest.

**[\*55]** 142(a)(1); <u>Harlan v. Commissioner</u>, 116 T.C. 31, 39 (2001). Therefore, when, as here, the Commissioner relies on the partnership anti-abuse regulation not to sustain an adjustment in the FPAA but instead to establish an omission from partnership gross income sufficient to prevent the propriety of any such adjustments from being rendered moot by the statute of limitations, the Commissioner has the burden of proving the absence of a business purpose for the transactions in issue. Respondent has not met that burden.[19] Thus, our parsing of the terms of the abuse-of-subchapter K rule confirms the result that might have

---

[19]Even if we were applying the abuse-of-subchapter-K rule for the purpose of assessing respondent's reallocation to petitioner of the partnership gain from DTDV's sale of OSI stock that the partnership reported as allocable to Square Leg, petitioner's failure to establish "a substantial business purpose" for the transactions in issue would not, by itself, be sufficient to justify respondent's adjustment under the anti-abuse regulation. Petitioner's failure to establish a substantial business purpose would mean that, under the plain terms of the abuse-of-subchapter-K rule, the transactions in issue had a principal purpose of achieving tax savings in a manner inconsistent with the intent of subchapter K. In that event, the regulation would allow respondent to recast the transactions--but only "as appropriate to achieve tax results that are consistent with the intent of subchapter K". Sec. 1.701-2(b), Income Tax Regs. If the only respect in which the parties' achieving the tax savings in issue was inconsistent with the intent of subchapter K was petitioner's failure to establish a sufficient nontax purpose for the transactions, how would respondent's recast--disregarding altogether Square Leg's participation in DTDV--be more consistent with the intent of subchapter K? In particular, how would the intent of subchapter K justify reallocating from Square Leg to petitioner a share of partnership gain that duplicates gain that petitioner realized outside the partnership from his assignment to Square Leg of part of his partnership interest? Respondent offers us no good answers to those questions.

**[\*56]** been expected given our rejection of respondent's attempted reliance on the economic substance and step transaction doctrines: The terms of the rule do not justify respondent's recast of the transactions in issue to disregard Square Leg's participation as a partner in DTDV.[20]

VI.    Conclusion

Regardless of the propriety of the specific amount of gain from DTDV's sale of OSI stock that the partnership allocated to Square Leg, respondent has not established that Square Leg's interest in the partnership should be disregarded altogether. Therefore, petitioner validly transferred to Square Leg part of his interest in the partnership. It follows that DTDV was entitled to, and did, make an election under section 754 as a result of that transfer. Respondent concedes that, as a result of the October 2017 NPRM, the absence from the election statement included with DTDV's 2000 return of the signature of petitioner or any other partner does not invalidate the election. Respondent has agreed to allow DTDV to rely on the amendment to the regulations proposed in the October 2017 NPRM

---

[20]Respondent has provided us with no reason petitioner's use of a tax partnership allowed him to achieve an improper tax benefit that would not have been achievable without a partnership. In particular, petitioner's ability to defer taking into account realized gain by exchanging an appreciated asset for an annuity did not require his use of a partnership. Consequently, respondent makes no argument that the abuse-of-entity treatment rule supports his position, and we see no grounds for such an argument.

[*57] even though the amendment was not proposed until 16 years after DTDV filed its 2000 return (and after our trial of this case). Respondent makes no argument that the section 743(b) adjustment in respect of the OSI stock to which Square Leg was entitled was less than the $12,150,000 that DTDV reported (and, in any event, any overstatement of that adjustment was far less than 25% of DTDV's reported gross income for 2001). Because any omission from DTDV's gross income for 2001 was less than 25% of its reported gross income for that year, section 6229(c)(2) does not extend the period of limitations described in section 6229(a). Instead, that period expired on October 20, 2005, three years after DTDV filed its 2001 return. Because respondent did not issue his FPAA in this case until October 8, 2008, he would be unable to assess any tax that would result from our acceptance of the FPAA adjustments or penalty determinations. Therefore, we need not consider those adjustments or determinations on the merits.

<u>Decision will be entered for</u> <u>petitioner</u>.